IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

VIRGIL BUNN,

      Plaintiff,

v.                                   1:17-cv-01064-LF-JFR

SONNY PERDUE, as Secretary,
United States Department of Agriculture,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court on defendant Sonny Perdue's Motion for

Summary Judgment. Doc. 32. Plaintiff Virgil Bunn opposes the motion. *See* Doc. 39. The

motion was fully briefed on December 20, 2018. *See* Docs. 44, 46. The parties consented to my

entering final judgment in this case. *See* Docs. 11, 12, 13. For the following reasons, I GRANT

defendant's motion.

## I.      <u>Statement of Facts</u>[1]

Virgil Bunn started working on January 31, 2011 as a Human Resources Assistant at the

U.S. Forest Service's (USFS) Albuquerque Service Center. UMF 1. At the Service Center, he

was referred to as a "Contact Center agent," and his responsibilities included receiving calls or

other HR inquiries regarding topics such as benefits, Workers Compensation, and payroll. *See*

UMF 6. Contact Center agents were responsible for creating a case based on each inquiry,

---

[1] Mr. Bunn admits defendant's Undisputed Material Facts (UMFs) 1−16, 18, and 22−29, which
are contained in Doc. 32 at 3−9. Doc. 39 at 1−2. Consequently, for these facts, the Court will
simply rely on the UMF. For facts that Mr. Bunn disputes, the Court will cite to the relevant
exhibits.

researching the solution, and logging the response into the Customer Relations Management (CRM) system.  *See id.*

Mr. Bunn was subject to a one-year probationary period.  UMF 1.  He is male and was born in October 1962.  UMF 2.  Melanie Wasserman was Mr. Bunn's first-line supervisor from his start date until early October 2011, and again from early December 2011 until he was terminated on January 6, 2012.  UMFs 3, 23.  Tamara Holguin was a lead trainer working on Ms. Wasserman's team.  *Id.*  She reviewed the work of Contact Center agents working under Ms. Wasserman, including Mr. Bunn's work.  *Id.*

In October 2011, Mary Furr became Mr. Bunn's first-line supervisor.  UMF 4.  Ms. Furr continued to supervise Mr. Bunn until December 6, 2011.  *Id.*  Isabel Peters was a lead trainer working on Ms. Furr's team, and she reviewed the work of Contact Center agents working under Ms. Furr, including Mr. Bunn's work.  *Id.*

Mr. Bunn took the CRM Basics and the Contact Center ("CC") Basics training courses multiple times.  UMF 7.  Mr. Bunn also received additional training from Ms. Wasserman, Ms. Holguin, Ms. Furr, and Ms. Peters.  *Id.*  Beginning in October 2011, Ms. Furr noticed that Mr. Bunn was not performing at a satisfactory level.  UMF 8.  Mr. Bunn had problems creating cases, providing the appropriate information in the case notes, researching the right answers, and forwarding inquiries to the correct departments.  *Id.*  On October 17, 2011, Ms. Furr directed Mr. Bunn to send all his cases to Ms. Peters for review.  *Id.*  Ms. Furr documented her concerns about Mr. Bunn's performance in contemporaneous notes.  *See id.*  Ms. Furr kept Mary Nelson—Mr. Bunn's second-line supervisor—informed of Mr. Bunn's job performance.  UMFs 5, 9.  Ms. Furr informed Ms. Nelson that Mr. Bunn was not handling his caseload properly, and that he had hundreds of unread emails.  UMF 9.

Beginning in November 2011, Ms. Furr and other managers raised concerns about Mr. Bunn's job performance with Employee Relations. UMF 10. Specifically, on November 10, Ms. Furr informed Aaron Aragon in Employee Relations that Mr. Bunn was not keeping up with his caseload, was missing notes and research, did not respond to emails, was not using Quick Codes and Branch Scripts, had missed a training session, and lacked focus. *Id.*

Four days later, on November 14, 2011, Mr. Bunn first complained to Ms. Furr about Ms. Peters' communications with him. UMF 11. He complained to Ms. Furr that Ms. Peters was sarcastic, and that he did not like the tone of her communications. *Id.* Mr. Bunn provided emails to Ms. Furr as examples. *See id.* Ms. Furr reviewed the emails and believed that Ms. Peters' communications were professional and direct. *Id.* Ms. Nelson also reviewed the emails and thought that they were direct and fair. *Id.* To be sensitive to Mr. Bunn's feelings, however, Ms. Furr cautioned Ms. Peters about her word choices. *Id.* None of Ms. Peters' communications with Mr. Bunn, however, contained any reference to Mr. Bunn's age, sex, or any other protected characteristic. *Id.* Mr. Bunn also never told Ms. Furr or anyone else in management that Ms. Peters was harassing him based on his age, sex, or any other protected characteristic. *Id.*

On November 25, 2011, Mr. Bunn sent Ms. Nelson a training proposal and asked to be reassigned back to Ms. Holguin as his lead trainer. UMF 12. In his proposal Mr. Bunn recognized there were issues concerning his cases, including whether he was providing detailed information in his case notes, the degree and level of research he performed before closing a case and/or referring it to another Provider Group, and whether he was forwarding cases to the correct Provider Group. *See id.* In late November, Ms. Nelson sent Mr. Bunn's proposal to the Branch Chief, Richard Martinez. *Id.* At around the same time, Ms. Nelson obtained additional information from Ms. Wasserman and Ms. Furr regarding Mr. Bunn's job performance. UMF

13. Ms. Wasserman informed Ms. Nelson that Mr. Bunn had missed some key items in his cases, did not complete his cases in a timely manner, and had begun cancelling training sessions. *Id.* Similarly, Ms. Furr informed Ms. Nelson that Mr. Bunn had not kept up with his cases, was not entering appropriate notes in many of his cases, and was not performing sufficient research for many of his cases. *Id.* Armed with this additional information, Ms. Nelson decided to propose terminating Mr. Bunn. *Id.* On December 1, 2011, Ms. Nelson wrote a proposal to terminate Mr. Bunn. UMF 14. In the proposal, Ms. Nelson explained that Mr. Bunn was missing key items, was struggling with basic topics despite repeating basic training courses, and that he was far behind where he should be. *Id.*

On December 2, 2011, Ms. Wasserman sent an email regarding Mr. Bunn's job performance to Arthur Gonzales, Assistant Director for Human Resources Management; Richard Martinez, Branch Chief; and Mary Nelson. UMF 15. Ms. Wasserman[2] said that Mr. Bunn was struggling, that one of her "top agents" would sit with Mr. Bunn for two hours each day, and that Mr. Bunn had to attend basic classes twice. *Id.* Ms. Wasserman thought there had been a lot of documentation and one-on-one time spent with Mr. Bunn, but that there was no improvement and that a request to terminate him was not unreasonable. *Id.*

Mr. Martinez, the Branch Chief, and Ms. Nelson met with Mr. Bunn on December 6, 2011. UMF 16. At the meeting, Mr. Bunn asked to be transferred from the Contact Center to the IT Department. *Id.* Mr. Martinez explained that he was not able to transfer Mr. Bunn to IT. *Id.* Mr. Martinez and Ms. Nelson did agree, however, to transfer Mr. Bunn back to Ms.

---

[2] The motion mistakenly attributes these statements to Ms. Nelson, but the statements were contained in an email authored by Ms. Wasserman. *Compare* Doc. 32 at 6, ¶ 15 *with* Doc. 32-3 at 29.

Wasserman's team, effective immediately.  *Id.*  From December 6, 2011 to January 6, 2012, Mr. Bunn continued to work as a Contact Center agent on Ms. Wasserman's team.  UMF 18.

The day after Mr. Bunn was transferred back to Ms. Wasserman's team, a Contact Center supervisor sent an email to Contact Center employees announcing that there would be a town hall meeting the next day with then Secretary of Agriculture Tom Vilsack.  Doc. 32-3 at 32.  Due to limited seating, the agency announced that it would randomly select ten people to attend the meeting.  *Id.*  Mr. Bunn was not one of the people selected.  *See id.* at 31.  Mr. Bunn contends that he was not permitted to attend the town hall meeting because of his complaint against Ms. Peters.  Doc. 39 at 2.

Mr. Martinez and Ms. Nelson discussed Mr. Bunn's job performance with Arthur Gonzales, the Assistant Director for Human Resources Management.  UMF 17.  Ms. Nelson informed Mr. Gonzales that Mr. Bunn was performing far below his expected performance level, that he was not receptive to constructive criticism, that he missed key items, and that he failed to show up for scheduled training sessions.  Doc. 32-4 at 2, ¶ 4; *see also id.* at 4−5.  Mr. Martinez and Ms. Nelson informed Mr. Gonzales that Mr. Bunn had received adequate training and had been given the opportunity to improve.  Doc. 32-4 at 2, ¶ 5.  Although Mr. Bunn concedes he received training, he claims that "the Agency failed to provide all the training to ensure [he] would be fully successful with his new Supervisory Team/Mary Fur[r]-Isabel Peters in October 2011."  Doc. 39 at 1; Doc. 39-6 at 16.  Based on the information he received from Mr. Martinez and Ms. Nelson, and from Mr. Bunn's supervisors, Mr. Gonzales decided to terminate Mr. Bunn.  Doc. 32-4 at 3, ¶ 7.

On December 7, 2011, Mr. Martinez contacted Erica Nieto, an Employee Relations Supervisor, regarding management's proposal to terminate Mr. Bunn's employment.  Doc. 32-5

at 2, ¶ 5; *see also id.* at 10.  Ms. Nieto followed up with USFS management, including Mr. Gonzales, Mr. Martinez, and Ms. Nelson, and collected information about the proposed termination.  Doc. 32-5 at 2−4, ¶¶ 4−11; *see also id.* at 10−12.  Employee Relations put together an Employee Relations case assessment of Mr. Bunn.  Doc. 32-5 at 14−15.  Ms. Nieto believed that the documentation was sufficient to warrant termination.  Doc. 32-5 at 5, ¶ 12.  Once the case assessment was complete, Ms. Nieto sent it to Shannon Swaziek, the Employee Relations Branch Chief.  *See* Doc. 32-5 at 4, ¶ 11; *id.* at 13.  Once Ms. Swaziek completed her review, she sent the case to the U.S. Department of Agriculture for final concurrence and for the delegation of authority to terminate Mr. Bunn.  Doc. 32-5 at 4, ¶ 11.  On January 4, 2012, Robin Heard, Deputy Assistant Secretary for Administration of the U.S. Department of Agriculture, delegated authority to Arthur Gonzales to terminate Mr. Bunn.  UMF 22.  On January 6, 2012, Mr. Gonzales terminated Mr. Bunn during Mr. Bunn's probationary period.  UMF 23.

Before his termination, on December 13, 2011, Mr. Bunn contacted the USFS's EEO Counselor Office to initiate pre-complaint counseling.  *See* Doc. 44-1 at 2; Doc. 39 at 5, ¶ 18; Doc. 39-8.  Sometime in the ten days between December 13 and December 23, 2011, Ms. Nieto learned of Mr. Bunn's informal EEO claim against Ms. Peters.  Doc. 32-5 at 4, ¶ 10; Doc. 39-8. Ms. Nieto did not inform any of Mr. Bunn's managers about the EEO case to avoid the perception that it influenced the decision-making.  Doc. 32-5 at 4, ¶ 10.  Mr. Gonzales, the deciding official, did not know about Mr. Bunn's EEO activity when he terminated Mr. Bunn. Doc. 32-4 at 3, ¶ 10.  Ms. Furr and Ms. Nelson—Mr. Bunn's first and second-line supervisors,

respectively—also did not know about Mr. Bunn's EEO activity during this time.[3]  Doc. 32-2 at 7, ¶ 19; Doc. 32-3 at 9, ¶ 25.

Two months after his termination, by letter dated March 12, 2012, the USFS informed Mr. Bunn that he had the right to file a formal discrimination complaint within 15 days of his receipt of the letter.  UMF 24; Doc. 32-6.  The letter stated that Mr. Bunn alleged that he was harassed and terminated because of his age and sex.  *Id.*

On March 31, 2012, Mr. Bunn filed his formal employment discrimination complaint.  UMF 25; Doc. 32-7.  Mr. Bunn's complaint alleged that Ms. Peters harassed him and created a hostile work environment, and that his managers did not remove him from that environment.  UMF 25; Doc. 32-7 at 3.  The complaint also alleged that Contact Center management retaliated against him by excluding him from the town hall meeting, by terminating his employment, and by failing to provide him union representation.  UMF 25; Doc. 32-7 at 3−4.  Mr. Bunn also made additional claims relating to the lack of assistance from union representatives.  *Id.*

Nearly four years later, on March 21, 2016, the EEOC Administrative Judge issued an Order of Dismissal, granting the Department of Agriculture's motion for summary judgment on all claims.  UMF 26.  The Order of Dismissal noted that Mr. Bunn had dropped his allegation of age discrimination early in the investigation.  UMF 26; Doc. 32-8 at 2 n.1.  On April 7, 2016, the Department of Agriculture, Office of Adjudication, issued the Final Order implementing the EEOC Administrative Judge's decision.  UMF 27; Doc. 32-9.  On May 25, 2017, Mr. Bunn appealed the agency's final action.  UMF 28; Doc. 32-10.  Mr. Bunn did not, however, appeal

---

[3] Mr. Bunn claims that "[l]eadership was aware or should have been made aware of any EEO activity from the USFS EEO Counselor Office.  It is unreasonable to assume Management had no knowledge of Mr. Bunn's EEO complaint."  Doc. 39 at 2, ¶ 6.  But Mr. Bunn does not cite to any evidence that Mr. Gonzales, Ms. Furr, or Ms. Nelson were aware of any of his EEO activity prior to his termination.  *See id.*

the dismissal of his age claim or his union claims.  UMF 28.[4]  On July 21, 2017, the Office of

Federal Operations issued its decision affirming the Final Agency Decision.  UMF 29.[5]

## II.    Discussion

### A.  Legal Standard for Summary Judgment

Summary judgment will be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(a).  A genuine dispute exists if "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party" on the issue.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment."  *Id.*

The movant bears the initial burden of establishing that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law.  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323–24 (1986).  "[T]he movant need not negate the non-movant's claim,

but need only point to an absence of evidence to support the non-movant's claim."  *Kannady v.*

*City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Sigmon v. CommunityCare HMO,*

*Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).  If this burden is met, the non-movant must come

forward with specific facts, supported by admissible evidence, which demonstrate the presence

of a genuine issue for trial.  *Celotex*, 477 U.S. at 324.  The non-moving party cannot rely upon

---

[4] The government refers to Defendant's Exhibit J to support this statement.  Doc. 32 at 9, ¶ 28.
Only the first page of Mr. Bunn's appeal is attached as Exhibit J and does not state all the issues
raised in the appeal.  *See* Doc. 32-10.  Mr. Bunn, however, admits UMF 28, Doc. 39 at 2, ¶ 7,
and the Court therefore will rely on Mr. Bunn's admission to determine that this statement is
true.

[5] The government refers to Defendant's Exhibit K as support for this UMF, but Exhibit K is not
attached to the motion.  *See* Docs. 32-1 to 32-10.  Mr. Bunn, however, admits this UMF, Doc. 39
at 2, ¶ 7, and the Court will rely on Mr. Bunn's admission to determine that this statement is true.

conclusory allegations or contentions of counsel to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988). Rather, the non-movant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (alteration in original) (internal quotation marks omitted).

At the summary judgment stage, the Court must view the facts and draw all reasonable inferences in the light most favorable to the non-movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court's function "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* Summary judgment may be granted where "the evidence is merely colorable, or is not significantly probative." *Id.* at 249–50 (internal citations omitted).

### B. The Defendant's Motion for Summary

In count I of his complaint, Mr. Bunn alleges that the defendant Department of Agriculture retaliated against him for making an EEO claim against his supervisor, in violation of 42 U.S.C. § 2000e-3(a). Doc. 1 ¶¶ 30−33. Mr. Bunn also seems to allege in count I that he was subjected to a hostile work environment based on his sex and age,[6] in violation of 42 U.S.C.

---

[6] Mr. Bunn mentions age discrimination in his complaint only twice, Doc. 1 ¶¶ 9, 35, and he does not detail any conduct by any supervisor that suggests he was subjected to a hostile work environment or fired because of his age. *See generally* Doc. 1; *see also* Doc. 39 at 11−12. He does not dispute that he dropped his age discrimination claim during the administrative process. UMFs 26, 28; Doc 39 at 2, ¶ 7. Mr. Bunn seems to have abandoned his claim of age discrimination, but I mention it because he vaguely alludes to it in his complaint.

§ 2000e-2(a). *See* Doc. 1 ¶¶ 7(a)−(c), 9, 13, 15, 18, 20−22, 31. Count II of the complaint alleges that defendant deprived Mr. Bunn of his constitutional rights "by failing and refusing [to] protect Plaintiff based on his age and a hostile work environment after he asserted his rights to be free from employment discrimination," in violation of 42 U.S.C. § 1983. Doc. 1 ¶¶ 34−36.

Defendant contends that Mr. Bunn's claims of retaliation fail because Mr. Bunn's informal complaints about Ms. Peters' "verbal abuse" did not constitute protected activity under Title VII, the termination process started before Mr. Bunn contacted an EEO counselor, neither the proposing official nor the deciding official knew of Mr. Bunn's EEO activities, and because the agency has articulated a legitimate, non-retaliatory explanation for its activities, and Mr. Bunn has failed to demonstrate pretext. Doc. 32 at 13−18. Defendant also argues that the Court should grant summary judgment on Mr. Bunn's "miscellaneous" retaliation claims because all the events that Mr. Bunn complains of pre-date his EEO counseling, making it impossible that any action was motivated by Mr. Bunn's EEO activities. *See id.* at 18−22. Mr. Bunn argues that even though he did not make a formal EEO complaint before the decision to terminate him was made, defendant was on notice that he was making a hostile work environment claim against Ms. Peters. Doc. 39 at 9−10. Further, it could not be a coincidence that he was fired after he complained. *Id.* at 11. According to Mr. Bunn, USFS did not have sufficient documentation to fire him, and his supervisors did not begin to document his purported poor performance until October 2011 as pretext to justify his termination. *Id.* at 10.

With respect to the hostile work environment claims, defendant argues that Mr. Bunn's allegations do not amount to the "sufficiently severe or pervasive" conduct necessary to alter the conditions of Mr. Bunn's employment. Doc. 32 at 22−26. Also, there is no evidence that any of the alleged harassment was related to Mr. Bunn's age or sex, or any other protected

characteristic. *Id.* at 26−27. Mr. Bunn counters that using a reasonable employee standard, Ms. Peters' conduct resulted in a hostile work environment. Doc. 39 at 10. The fact that he was required to continue to work under Ms. Peters' supervision after he complained also shows that he was subjected to a hostile work environment. *Id.* at 11−12. And because he previously received successful evaluations, he says that performance issues were only a pretext for firing him. Doc. 39 at 11.

Defendant asserts that Mr. Bunn's § 1983 claims fail because Title VII is the only avenue for a federal employee to obtain judicial relief for employment discrimination, and because § 1983 only applies to state actors who violate a federal right, not to federal officials. Doc. 32 at 27. Mr. Bunn does not contest this assertion. *See generally* Doc. 39.

For the following reasons, I agree that defendant is entitled to summary judgment in his favor on Mr. Bunn's retaliation and hostile work environment claims. I further agree that Mr. Bunn cannot state a claim under § 1983. I therefore GRANT defendant's motion for summary judgment.

### C. Mr. Bunn's Retaliation Claims

Title VII makes it unlawful to retaliate against an employee for opposing any practices that the statute makes unlawful. 42 U.S.C. § 2000e–3(a). "To prevail on a Title VII retaliation claim, a plaintiff must establish that retaliation played a part in the employment decision." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008). This burden may be satisfied in one of two ways. Under the direct or "mixed motives" approach, a plaintiff may offer direct evidence that retaliation played a "motivating part" in the adverse employment decision. *Id.* at 1225. If the plaintiff can prove that retaliatory animus was a motivating factor, the burden then shifts to the employer to demonstrate that it would have taken the same action absent the

retaliatory motive. *Id.*

Alternatively, in the absence of direct evidence, a plaintiff may proceed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under this framework, Mr. Bunn first must establish a prima facie case of retaliation by showing (1) "that he engaged in protected opposition to discrimination," (2) "that a reasonable employee would have found the challenged action materially adverse," and (3) "that a causal connection exists between the protected activity and the materially adverse action." *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 803 (10th Cir. 2007). To establish the requisite causal connection between his protected conduct and his termination, Mr. Bunn must show that a desire to retaliate against him for his protected activity motivated the USFS to terminate him or otherwise take adverse action against him. *See Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003). As a prerequisite to this showing, Mr. Bunn must come forward with evidence from which a reasonable factfinder could conclude that those who decided to fire him (or take a materially adverse action against him) had knowledge of his protected activity. *See Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) ("To satisfy [the causal connection] element, a plaintiff must show that the individual who took adverse action against [him or her] knew of the employee's protected activity." (quotation omitted)).

"Once the plaintiff successfully asserts a prima facie retaliation case, the burden shifts to the defendant (i.e., employer) to come forward with a legitimate, non-retaliatory rationale for the adverse employment action. If the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015) (internal quotation marks, ellipses, and citation omitted). As the Tenth Circuit has explained, "[p]retext can be inferred from evidence revealing 'weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions' in the employer's explanation," or it can be shown "by providing direct evidence discrediting the proffered rationale, or by showing that the plaintiff was treated differently from others similarly situated." *Id.* (internal quotation marks and citations omitted). In this case, Mr. Bunn has elected to proceed under the *McDonnell Douglas* burden-shifting framework. *See* Doc. 39 at 9−11.

## 1. Protected Opposition to Discrimination

With respect to the first prong of the *McDonnell Douglas* framework, all parties agree that Mr. Bunn's contact with the USFS's EEO Counselor Office on December 13, 2011 constituted protected activity. But USFS's decision to terminate Mr. Bunn began on December 1, 2011, when Ms. Nelson wrote her proposal to terminate Mr. Bunn. As the Supreme Court explained, "[e]mployers need not suspend previously planned [adverse employment actions] upon [encountering an employee's protected activity], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark County School District v. Breeden*, 532 U.S. 268, 272 (2001). Thus, the Court must determine whether any of Mr. Bunn's complaints about Ms. Peters before December 1, 2011 constituted protected activity.

"Protected activities fall into two distinct categories: participation or opposition." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir.1998). The "participation clause" provides that an employer may not retaliate against an employee "because [the employee] has . . . *participated in any manner* in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a) (emphasis added). The "opposition clause," meanwhile, provides that an employer may not retaliate against an employee "because he [or she] has opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-

3(a).  Here, there is no dispute that Mr. Bunn did not fall within the participation clause before

December 1, 2011.  Instead, Mr. Bunn argues that his "informal complaint[s] . . . should be

considered protected activity" under the opposition clause.  *See* Doc. 39 at 8−10 (arguing that

Mr. Bunn engaged in protected opposition to discrimination).

      "[T]o qualify as protected opposition the employee must convey to the employer his or

her concern that the employer has engaged" in unlawful discrimination.  *Hinds v. Sprint/United*

*Management Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).  General complaints about a manager

are not sufficient.  *Id.*  Mr. Bunn says that he "informed his supervisor Mary Fur[r] about verbal

abuse he received from Isabel Peters on diverse occasions, October 2011 (PE ["Plaintiff's

Exhibit"] 1), November 14, 2011 (PE 14) and November 28, 2011 (PE 13)."  Doc. 39 at 4, ¶ 12.

And although he acknowledges that his complaints did not "specifically address" a

discrimination charge, he says that the complaints were sufficient to put the USFS on notice

about the "hostile work environment created by Ms. Peters."  Doc. 39 at 9−10.

      The problem with Mr. Bunn's argument is that none of his complaints about Isabel Peters

suggested that he believed Ms. Peters was harassing him or treating him differently because of

his age or sex.  Mr. Bunn admitted in his deposition that he never told Ms. Furr or anyone else in

management that Ms. Peters was harassing him based on his age or sex, or any other protected

characteristic.  Doc. 32-1 at 14.  The emails and comments by Ms. Peters about which Mr. Bunn

complained also did not refer to Mr. Bunn's age or sex, or any other protected characteristic.  *See*

UMF 11; *see also* Doc. 32-1 at 7−14.  Nothing about any of Mr. Bunn's complaints was

sufficient to put USFS management on notice that he was concerned that Ms. Peters was

engaging in unlawful discrimination before the decision to terminate him was initiated.

Therefore, Mr. Bunn cannot establish the first prong of a prima facie case of retaliation, and

defendant is entitled to summary judgment in his favor on Mr. Bunn's retaliation claims.

### 2. *Materially Adverse Action*

In the context of a retaliation claim, a materially adverse action is an action "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). The parties do not dispute that Mr. Bunn's termination was a materially adverse action. Thus, if Mr. Bunn could establish that he engaged in protected activity, was fired, and that there was a causal connection between the protected activity and his firing, he could establish a prima facie case of retaliation. However, as explained in both the preceding and following sections, Mr. Bunn cannot prevail on either the first or third prongs under this theory.

In his motion for summary judgment, the defendant addresses other actions that Mr. Bunn claimed in his deposition were materially adverse. *See* Doc. 32 at 18−22. These actions consisted of being required to work with Ms. Peters, being excluded from the Town Hall meeting, being denied union representation when he met with management on December 6, 2011, and a misstatement regarding a training program. *See id.* Although the Court is not convinced that any of these actions, either alone or in combination, would qualify as materially adverse actions in the context of a retaliation claim, all the actions predate Mr. Bunn's protected activity, that is, his contact with the EEO counselor on December 13, 2011. Thus, none of these actions could have been taken in retaliation for his protected activity, and there is no causal connection between any of these actions and his protected activity.

For example, Mr. Bunn asserted that he was retaliated against by being forced to work with Ms. Peters. *See* Doc. 32 at 18; Doc. 39 at 10. But Mr. Bunn was transferred away from Ms. Peters on December 6, 2011, UMF 16, seven days before his protected activity took place. The town hall meeting with then-Secretary Vilsack, which Mr. Bunn was not selected to attend, took

place on December 8, 2011, *see* Doc. 32-3 at 32, five days before Mr. Bunn's contact with the EEO counselor. Mr. Bunn claims he was denied union representation at his December 6, 2011 meeting with management, Doc. 39 at 3, but again, this was seven days before he engaged in protected activity. With regard to the purported misstatement regarding the training that Mr. Bunn had received, *see* Doc. 32-4, ¶ 5; Doc. 32-1 at 26−28, this statement was made no later than December 6 or 7, 2011, before Mr. Gonzales decided to terminate Mr. Bunn. Because all of these actions predated his protected activity, management would have had no knowledge of any protected activity, and there could be no causal connection between any of these actions and Mr. Bunn's protected activity. Thus, none of these actions—other than Mr. Bunn's termination— could satisfy the materially adverse action prong of a prima facie retaliation claim.

### 3. *Causal Connection Between Materially Adverse Action and Protected Activity*

Mr. Bunn also cannot establish a prima facie case of retaliation because he cannot establish a causal connection between his termination and any protected activity. As explained above, Mr. Bunn's first protected activity occurred on December 13, 2011, when he contacted the USFS EEO counselor's office. By that time, Ms. Nelson already had submitted her written proposal to terminate Mr. Bunn, UMF 14, and Mr. Martinez had contacted the Employee Relations department to start the termination process, Doc. 32-5 at 2, ¶ 5; *id*. at 10. As already discussed, even though Mr. Bunn's termination was not final before he engaged in protected activity, the USFS was not required to suspend Mr. Bunn's previously planned termination upon discovering that he had filed an EEO complaint. "[P]roceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Breeden*, 532 U.S. at 272. In other words, the simple fact that Mr. Bunn was terminated as previously planned, and that his termination occurred after he filed an EEO complaint, is insufficient to establish a causal connection between his termination and his protected activity.

In addition, there is no evidence that either Mr. Gonzalez, the deciding official, or Mary Nelson, the proposing official, knew of Mr. Bunn's EEO activity before he was terminated. Both Mr. Gonzalez and Ms. Nelson stated under oath that they had no knowledge of Mr. Bunn's EEO activity before he was terminated. Doc. 32-3 at 9, ¶ 25; Doc. 32-4 at 3, ¶ 10. Mr. Bunn admitted during his deposition that he had no evidence that Mr. Gonzales knew about his EEO complaint when Mr. Gonzales decided to terminate him. Doc. 32-1 at 30. And although Ms. Nieto in the Employee Relations department learned of Mr. Bunn's EEO complaint before Mr. Bunn's termination was finalized, she did not share that information with any of Mr. Bunn's managers to make sure that it would not influence their decision-making. *See* Doc. 32-5 at 4, ¶ 10.

In response, Mr. Bunn states:

> Leadership was aware or should have been made aware of any EEO activity from the USFS EEO Counselor Office. It is unreasonable to assume Management had no knowledge of Mr. Bunn's EEO complaint. Specifically, EEOC Representative Lynda Rogers sent an official letter to the Agency regarding the complaint filed by Mr. Bunn and called Randall Pratt directly to ask him for a copy of Mr. Bunn's Performance Appraisal.

Doc. 39 at 2, ¶ 6. But Mr. Bunn cites to no evidence that supports these statements. *See id.*; *see also L & M Enters., Inc. v. BEI Sensors & Sys. Co*., 231 F.3d 1284, 1287 (10th Cir. 2000) ("Unsupported conclusory allegations . . . do not create a genuine issue of fact."). Thus, there is no admissible evidence to support Mr. Bunn's claim that USFS "leadership" was aware of his EEO activity, and Mr. Bunn cannot establish any causal connection between his termination and his EEO activity because the decisionmakers simply did not know about it. *See Peterson v. Utah Dept. of Corrections*, 301 F.3d 1182, 1188 (10th Cir. 2002) ("an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII"). Defendant is entitled to summary judgment in his favor because Mr. Bunn cannot

establish a prima facie retaliation claim.[7]

### D.  Mr. Bunn's Hostile Work Environment Claims

Under Title VII, "it is 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  Similarly, the Age Discrimination in Employment Act ("ADEA") prohibits an employer from "fail[ing] or refus[ing] to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  "For a hostile environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Penry v. Fed. Home Loan of Topeka*, 155 F.3d 1257, 1261 (10th Cir.1998) (quotation omitted).  The plaintiff also must produce evidence that he or she is the object of harassment because of his or her protected characteristic.  *See id.* ("The plaintiff must produce evidence that she was the object of harassment because of her gender.").  In other words, Mr. Bunn must show that Ms. Peters harassed him because of his sex or age, or some other protected characteristic.

To evaluate whether a working environment is sufficiently hostile or abusive, the Court examines the totality of the circumstances, including:  (1) the frequency of the discriminatory

---

[7] Because Mr. Bunn cannot establish a prima facie claim of retaliation, it is not necessary for the Court to address the defendant's argument that even if Mr. Bunn could establish a prima facie case, the USFS had legitimate, non-discriminatory reasons to terminate Mr. Bunn.  *See* Doc. 32 at 16−18.

conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. *Harris v. Forklift Sys., Inc.* 510 U.S. 17, 23 (1993) (applying framework to sex-based hostile work environment claim); *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005) (applying same framework to age-based hostile work environment claim), *abrogated on other grounds by Lincoln v. BNSF Railway Company*, 900 F.3d 1166, 1185 (10th Cir. 2018). The plaintiff also must show that the environment was both subjectively and objectively hostile or abusive. *Davis v. U.S. Postal Serv*., 142 F.3d 1334, 1341 (10th Cir. 1998).

Neither Title VII nor the ADEA, however, establishes "a general civility code" for the workplace. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *accord Dick v. Phone Directories Co*., 397 F.3d 1256, 1263 (10th Cir. 2005). Run-of-the-mill rude, juvenile, or annoying behavior is not sufficient to support a Title VII hostile work environment claim. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (discussing the Supreme Court's hostile work environment decisions, and stating that "[a] recurring point in these opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment" (citation omitted) (quoting *Oncale*, 523 U.S. at 82) (internal quotation marks omitted)); *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) ("Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life."); *DeNovellis v. Shalala*, 124 F.3d 298, 310 (1st Cir. 1997) ("Not all offensive conduct is actionable as harassment; trivial offenses do not suffice."). "An employer creates a

hostile work environment when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 851 (10th Cir. 2007) (quoting *Davis*, 142 F.3d at 1341) (internal quotation marks omitted).

In this case, Ms. Peters' comments about which Mr. Bunn complained fall far short of demonstrating pervasive or severe harassment. In his deposition, Mr. Bunn testified that the worst comment Ms. Peters ever made to him was at the end of a telephone conversation that Ms. Peters had with her husband. *See* Doc. 32-1 at 7−8. Mr. Bunn was with Ms. Peters in her cubicle when she took a cell phone call from her husband. *See id.* at 8. Mr. Bunn "stood up to leave the cubicle to give her privacy," but Ms. Peters "motioned with her hand like this (indicating) and summoned [him] to sit down, which [he] thought was rude." *Id.* When she completed her call, Ms. Peters said, "See Virgil. I don't just talk to you like that. I talk to my husband this way too." *Id.*

Mr. Bunn also complained that Ms. Peters sent him emails that were "rude," "sarcastic," and "condescending," Doc. 32-1 at 9−14, including:

> Now, according to my Cisco, you have taken 19 calls as of right now, however there are only two cases in your worklist. It is highly unlikely that all the calls taken today were "how do I apply?" Doc. 32-2 at 15 (email dated 10/17/2011).

> What was she trying to edit? Who is her supervisor? Did you troubleshoot for her? Understand that we are not a switchboard. Our purpose is to try to solve the issue[.] If we can't then it goes forward. *Id.* at 16 (email dated 11/14/2011).

> I asked for this case to be done first. Why? Because if pay issues are not addressed in a timely manner, it affects the employee in a major way. I know I don't want to go unpaid. In this case, someone pushed the T&A through, and the

employee will be paid.  Nonetheless, pay issues are critical.  *Id.* at 18 (email dated 11/25/2011).

Although the above emails may be blunt and lack tact, none of them demonstrate severe or pervasive harassment based on Mr. Bunn's age or sex.  Altogether there are seven emails over a six-week period in which Ms. Peters bluntly (and sometimes sarcastically) tells Mr. Bunn to do things differently.  But none of the exemplar emails say anything about Mr. Bunn's age or sex, or any other protected characteristic.  *See* Doc. 32-2 at 15−21.  There is no suggestion that Ms. Peters treated Mr. Bunn the way she did because of his age or sex.  Nor has Mr. Bunn produced any additional evidence of communications with Ms. Peters that referenced in any way his sex or age, or any other protected characteristic.  *See* Doc 39; *see also* Docs. 39-1 to 39-15.

The only evidence that Mr. Bunn was the object of Ms. Peters' purported harassment because of some protected characteristic comes from Mr. Bunn's deposition testimony as follows:

> Q. . . . And you allege discrimination on the basis of gender.  Why do you think she discriminated against on the basis of gender?  What's the basis for that belief?
>
> A. I was an older guy, African-American.
>
> Q. Is that it?
>
> A. That's the only thing I could come up with.
>
> Q. So did she ever say anything about your age?
>
> A. Not that I can recall.
>
> Q. Did she ever say anything about your race?
>
> A. Not that I can recall.
>
> Q. And so you're basically assuming that it's based on your being an African-American older male just based on your identity; is that right?
>
> A. That's the only thing.  I mean, I—I don't know what she—I don't know why.  I don't know why she was harassing me.  I have no idea why and the

reason. I can't—I can't read her mind. But I mean, this is the only thing I can come up with.

Q. So—

A. If they're—they're giving me—you know, I have to use one of these, so what do you—

Q. Okay. So based—you understand that there are certain protected characteristics where discrimination is improper, correct?

A. Yes.

Q. Okay. And so today you've identified your being older, so there's age. A male, gender or sex. And also being African-American, correct?

A. But delay that. I have no reason. I don't know. I don't know. I—I retract my statement about why because I don't know.

Q. Okay.

A. I will just say that. That's the only thing I can say. I have no idea.

Q. So you have no idea why she spoke to you and motioned to you in the way that you just described?

A. No, I don't.

Q. And, likewise, you have no idea why she treated you in the way you consider harassing?

A. That's correct. I don't.

Q. And so you don't have any evidence that it was because of race?

A. I have—I have no idea. I have—I don't—I don't know.

Q. And you have no evidence that it was because of your age?

A. I don't know.

Q. And you have no evidence that it's because of your being a guy?

A. I don't know. I don't know.

Doc. 32-1 at 8.

Based on this evidence, no rational jury could find Mr. Bunn was subjected to a hostile

work environment because of his sex or age, or any other protected characteristic. The purported

abusive conduct occurred approximately once per week over the two-month period that Mr.

Bunn worked with Ms. Peters.  The conduct consisted mostly of emails that Mr. Bunn found to be rude, sarcastic, and condescending.  None of the conduct was physically threatening or humiliating; at most the communications were tactless and blunt.  And the conduct was intended to improve Mr. Bunn's work performance, not interfere with it.  Further, Mr. Bunn has failed to show that the environment was objectively hostile or abusive.  And finally, there is no evidence that Ms. Peters treated Mr. Bunn the way she did because of his sex or age, or any other protected characteristic.  Thus, the defendant is entitled to summary judgment in his favor on Mr. Bunn's hostile work environment claim.

### E.  Mr. Bunn's § 1983 Claim

Mr. Bunn makes no effort to contest the defendant's argument that Mr. Bunn's claim under 42 U.S.C. § 1983 fails as a matter of law.  As stated in the defendant's motion, "a federal employee's only avenue for judicial relief from federal employment discrimination is through Title VII." *Belhomme v. Widnall*, 127 F.3d 1214, 1217 (10th Cir. 1997).  Accordingly, "Title VII preempts any constitutional cause of action that a court might find . . . for discrimination in federal employment." *Id*.  In addition, "[s]ection 1983 is not directed at conduct by federal officials.  Instead, it provides a remedy against state actors who violate a federal right, pursuant to state authority." *Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 869 (10th Cir. 2016).  Mr. Bunn's claims arise entirely from the conduct of federal actors.  Therefore, § 1983 does not apply, and the Court will dismiss Mr. Bunn's § 1983 claim.

### IV.    Conclusion

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment (Doc. 32) in its entirety.  Summary Judgment is GRANTED in favor of defendant Sonny Perdue, as Secretary of the United States Department of Agriculture, on all Mr. Bunn's

retaliation and employment discrimination claims alleged in Count I of his Complaint.  Mr.

Bunn's claim under 42 U.S.C. § 1983 as alleged in Count II of his Complaint is DISMISSED

with prejudice for failure to state a claim.

**IT IS SO ORDERED.**

_____

Laura Fashing
United States Magistrate Judge
Presiding by Consent